**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMERIGAS PROPANE, L.P., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| OPINION CORP. d/b/a | : | NO.  12-713 |
| PISSEDCONSUMER.COM, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                            June 19 , 2012

        Defendant Opinion Corp. d/b/a PissedConsumer.com ("Defendant") has filed the present

Motion to Dismiss the Complaint of Plaintiff Amerigas Propane, L.P. ("Plaintiff") for Failure to

State a Claim Pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons,

the Motion is granted in part and denied part as set forth in the accompanying Order.

**I.        FACTUAL AND PROCEDURAL HISTORY**

        Plaintiff, a Pennsylvania limited partnership, is in the business of distributing propane.

(Compl. ¶¶ 3, 9.)  In connection with this business, Plaintiff owns a trademark registration for

"AMERIGAS."  (Id. ¶ 10.)  Defendant, a New York corporation, owns and operates a website

called "www.pissedconsumer.com," which allows individuals to post complaints concerning

various products and services they have used.  (Id. ¶¶ 13-18.)  According to the facts alleged in

the Complaint, Defendant "encourages and creates the most negative postings it can on the

PissedConsumer website, displays those postings as prominently on the Internet as possible, and

relates those postings as closely as possible to the companies' brand names."  (Id. ¶ 20.)  Once

these reviews are posted, Defendant uses them as an incentive to compel businesses to pay to have negative complaints hidden, removed, or changed into positive testimonials.  (Id. ¶¶ 20-21.) According to Plaintiff, Defendant refuses to reveal the identity of those who post complaints, leaving Plaintiff unable to determine whether the reviews are submitted by actual consumers, competitors, or Defendant itself.  (Id. ¶ 26.)

Plaintiff alleges that Defendant has used the "AMERIGAS" trademark in one of its website's subdomains—http://amerigas.pissedconsumer.com—and in the metadata[1] associated with the website.  (Id. ¶¶ 27-30.)  Furthermore, the website contains numerous advertisements—including those of Plaintiff's competitors—alongside a description of Plaintiff's business and the services it offers.  (Id. ¶¶ 32-33.)  According to Plaintiff, its competitors' advertisements are "displayed in a cluttered fashion and used in connection with AmeriGas's trademark," and so consumers are likely to be confused into believing that these advertisements are in some way associated with Plaintiff.  (Id. ¶ 35.)  Defendant is able to profit from these advertisements via Google's "AdWords" program, which generates revenue every time a user clicks on one of the ads.  (Id. ¶ 34.)

Plaintiff next alleges that Defendant engages in improper "search engine optimization"[2] techniques in an effort to make its website more prominent and accessible on search engines such

_____

[1]  The Complaint defines metadata as "data associated with a website that is written in HTML code and read by search engines that index the website.  Computer users using Internet Explorer can view a website's metadata if they select 'View' and 'Source' in the menu bar when visiting the website."  (Id. ¶ 30 n.1.)

[2]  Search engine optimization "refers to the process through which a company improves its website's visibility or ranking in search engines' 'natural' or unpaid search results."  (Id. ¶ 39.)

as Google.  (Id. ¶¶ 38-42.)  Specifically, Defendant has purportedly purchased hundreds of

domain names that link to its own website, created numerous subdomains that interlink to each

other, made excessive use of brand name "keywords" to increase its own website's relevance,

reposted identical consumer complaints to create the impression that they are new content, and

created Twitter accounts that link to Defendant's website without providing any other content.

(Id. ¶ 40.)  As a result of these tactics, Defendant's website now appears among the first several

results when an Internet user types "AmeriGas" into a Google search, despite the fact that

Defendant's page offers little, if any, content related to Plaintiff and its services.  (Id. ¶ 38.)

When Plaintiff became concerned about the impact of the negative reviews posted on

http://amerigas.pissedconsumer.com, it contacted Defendant to discuss PissedConsumer's

"reputation management services."  (Id. ¶¶ 43-46.)  These services purportedly offered Plaintiff

the opportunity to address the complaints, or even have negative reviews removed from

Defendant's website altogether.  (Id. ¶ 53.)  In January 2011, Defendant told Plaintiff it would

not be able to discuss the matter until the following month, but Defendant never contacted

Plaintiff to engage in such a discussion.  (Id. ¶¶ 46-47.)  Plaintiff then attempted to respond

directly to the complaints by posting its own messages on Defendant's page, but found that

Defendant blocked Plaintiff's computers from accessing the website.  (Id. ¶¶ 48-49.)

Plaintiff filed its Complaint in this Court on February 9, 2012, alleging the following: (I)

trademark infringement, unfair competition, and false designation of origin in violation of 15

U.S.C. §§ 1114 & 1125(a); (II) common law trademark infringement, unfair competition, and

false designation of origin; (III) dilution of Plaintiff's "AMERIGAS" mark in violation of 15

U.S.C. § 1125(c); (IV) violations of Pennsylvania's Unfair Trade Practices and Consumer

Protection Law, 73 Pa. C.S. § 201-1, et seq. ("the UTPCPL"); (V) interference with contractual and prospective contractual relations; (VI) unjust enrichment; and (VII) trademark counterfeiting in violation of the Lanham Act.  (Compl. ¶¶ 54-111.)  Plaintiff seeks preliminary and permanent injunctive relief; actual, compensatory, and punitive damages; and costs, attorneys' fees, and treble and statutory damages pursuant to 15 U.S.C. § 1117.  (Compl. 19-20 ("Prayer for Relief").)

Defendant filed the present Motion to Dismiss on April 2, 2012.  On April 19, 2012, Plaintiff filed its Response in Opposition, and Defendant filed a Reply Brief on April 27, 2012. The Motion is now ripe for the Court's consideration.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  It emphasized that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of

4

the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Notwithstanding the foregoing, nothing in Twombly or Iqbal has altered some of the fundamental underpinnings of the Rule 12(b)(6) standard of review. Arner v. PGT Trucking, Inc., No. Civ.A.09-0565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-0626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Fed. R. Civ. P. 8; Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.   DISCUSSION

Defendant first moves to dismiss Counts I, II, III, IV, and VII of the Complaint—which

sound in trademark infringement and unfair competition—on the basis that Plaintiff failed to allege sufficient facts to sustain these claims.  Second, Defendant contends that Counts IV, V, and VI—which are Pennsylvania state law claims—should be dismissed pursuant to the Communications Decency Act, 47 U.S.C. § 230.  The Court considers Defendant's two arguments separately.[3]

### A.     Whether Plaintiff has Stated a Claim for Trademark Infringement and Unfair Competition

The purpose of the Lanham Act, 15 U.S.C. §§ 1051, et. seq., is "to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'"  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992) (quoting 15 U.S.C. § 1127).  Count I of Plaintiff's Complaint alleges trademark infringement, unfair competition, and false designation of origin in violation of 15 U.S.C. § 1114[4] and §

---

[3]  The Motion to Dismiss also includes a brief analysis of why Plaintiff is not entitled to an injunction.  (Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem.") 24-26.)  Plaintiff contends that because it has not yet moved for a preliminary injunction, any discussion of this issue is premature.  (Pl.'s Resp. Opp'n 2.)  The Court agrees and declines to address injunctive relief unless and until Plaintiff makes an appropriate motion.

[4]  Section 1114 states in relevant part:

(1) Any person who shall, without the consent of the registrant—

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale,

1125(a).[5]  In order to state a claim under these sections of the Lanham Act, a plaintiff must

demonstrate: "(1) the mark is valid and legally protectable; (2) it owns the mark; and (3) the

defendant's use of the mark is likely to create confusion concerning the origin of goods or

services." Del. Valley Fin. Grp., Inc. v. Principal Life Ins. Co., 640 F. Supp. 2d 603, 619 (E.D.

Pa. 2009) (citing Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc., 318 F. App'x 146, 148

(3d Cir. 2009)).  "A likelihood of confusion exists when 'consumers viewing the mark would

probably assume that the product or service it represents is associated with the source of a

---

distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

[5]  Section § 1125(a) states in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

different product or service identified by a similar mark.'" A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000) (quoting Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 862 (3d Cir. 1992)). When the plaintiff and the defendant's goods do not compete with each other, the Third Circuit Court of Appeals has set forth a list of ten factors that district courts should consider when determining whether a likelihood of confusion exists:

> "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market."

A & H Sportswear, 237 F.3d at 211 (quoting Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983)).

Count II alleges common law trademark infringement, unfair competition, and false designation of origin. In Pennsylvania, common law trademark infringement and unfair competition are governed by the same standards as their federal counterparts, which were addressed above in discussing Count I. R&B, Inc. v. Needa Parts Mfg., Inc., 418 F. Supp. 2d 684, 697 n.1 (E.D. Pa. 2005). It is not clear that common law false designation of origin is a viable cause of action, as the Court was unable to find any cases or other authorities discussing this claim. Nevertheless, because neither party has addressed this issue, the Court assumes for the purposes of this Memorandum that Pennsylvania recognizes such a claim.

Count III is a claim for trademark dilution pursuant to 15 U.S.C. § 1125(c).  Dilution refers to "'the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product.'"  MarbleLife, Inc. v. Stone Res., Inc., 759 F. Supp. 2d 552, 561 (E.D. Pa. 2010) (quoting Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 489 (5th Cir. 2004)).  Section 1125(c) prohibits the "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).

Count IV is a claim for violation of the UTPCPL, which "'encompasses an array of practices which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty.'"  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 226-27 (3d Cir. 2005) (quoting DiLucido v. Terminix, 676 A.2d 1237, 1240 (Pa. Super. Ct. 1996)).  The statute provides a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act[.]"  73 Pa. Cons. Stat. § 201-9.2.[6]  Finally, Count VII is a claim for trademark counterfeiting, which is prohibited under 15 U.S.C. § 1114(1).  The elements of this

---

[6]  Plaintiff has not alleged that it has purchased or leased goods or services from Defendant for personal, family, or household use, and so it is not clear to the Court that Plaintiff has standing to bring a UTPCPL claim.  Indeed, Plaintiff has not specified which section of the statute Defendant has allegedly violated.  Nevertheless, neither party has addressed this issue, and so the Court will assume for the purposes of this Memorandum that Plaintiff has standing to proceed.

claim are identical to those of a claim for trademark infringement.  See, e.g., Coach, Inc. v. Sunfastic Tanning Resort, No. Civ.A.10-1626, 2011 WL 5447972, at *4 (E.D. Pa. Nov. 10, 2011).

In its Motion, Defendant does not separately address the elements and merits of Counts I, II, III, IV, and VII.  Rather, because they all relate to trademark infringement or unfair competition, Defendant groups these Counts together and seeks to dismiss them on the same five grounds: (1) Plaintiff has failed to allege the use of "AMERIGAS" as a trademark; (2) this case involves nominative fair use; (3) the Complaint does not allege a likelihood of confusion; (4) the doctrine of "initial interest confusion" is inapplicable to this action; and (5) Plaintiff has failed to plead a claim for secondary trademark liability.  The Court considers each of these five arguments separately.

### 1.      Whether Plaintiff Alleged the Use of "AMERIGAS" as a Trademark

Defendant first contends that Plaintiff's claims must fail because they do not allege that Defendant used "AMERIGAS" as a trademark.  Specifically, Defendant argues that "the message complained of is merely critical speech utilizing a trademark to accurately describe the trademark owner's produce or service.  It is not the offering of a competing good or service."  (Def.'s Mem. 7.)  In making this argument, Defendant relies on two cases from the District of New Jersey. First, in Cellco Partnership v. Communication Workers of America, No. Civ.A.02-5542, 2003 WL 25888375 (D.N.J. Dec. 11, 2003), the defendant was a labor union that used Plaintiff's trademark in statements made during a labor dispute.  Id. at *1.  The court found that the plaintiff had used the mark "as a means of bolstering its message as it attempted to maintain its members' employment and negotiate the continued terms of their employment[.]"  Id. at *4.  The court held

10

that "expression on the merits of a labor dispute" did not constitute a "use in commerce," and was therefore not actionable under the Lanham Act.  Id. at *8.

Next, in Howard Johnson International, Inc. v. Vraj Brig, LLC, No. Civ.A.08-1466, 2010 WL 215381 (D.N.J. Jan. 14, 2010), one of the defendants contracted with the plaintiff to use its "Howard Johnson" marks in connection with the operation of a hotel.  Id. at *1.  The contract was eventually terminated and the defendant ceased operating the hotel, but a billboard bearing the name "Howard Johnson" remained on the property.  Id. at *1-2.  In light of the fact that the hotel was no longer in use, the court rejected the plaintiff's argument that the presence of the billboard on the defendant's property violated the Lanham Act.  Specifically, the court found that the defendant never

> did anything other than passively allow a preexisting billboard containing [the plaintiff's] marks to remain standing on his property.  Therefore, [the defendant] never "used" the protected marks within the meaning of that term as it appears in the Lanham Act.  Furthermore, even if [the defendant] were held to have "used" [the plaintiff's] marks, he never offered or provided any goods or services at the lodging facility in question.  Therefore, his display of the marks does not satisfy the "in connection with goods or services" requirement either.

Id. at *7.  These two cases are distinguishable from the present matter.  In Cellco, the mark was used in the context of the defendant's labor dispute, not as part of any for-profit or other commercial activity.  In Howard Johnson, the mark was not "used" at all: the hotel which the billboard had previously advertised had ceased operating.  Here, by contrast, the Complaint alleges that Defendant uses Plaintiff's "AMERIGAS" trademark in its website's text, subdomain name, and metadata in connection with the sale of advertisements to Plaintiff's competitors. (Compl. ¶¶ 27-37.)  At least one other court in this District has held that a "defendant's use of [a] plaintiff's marks to trigger internet advertisements for itself is the type of use consistent with the

language in the Lanham Act[.]"  J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC, No. Civ.A.06-0597, 2007 WL 30115, at *6 (E.D. Pa. Jan. 4, 2007).[7]  Furthermore, Plaintiff also alleges that, for a fee, Defendant will allow businesses to address the complaints posted about them on the website.  (Compl. ¶¶ 44, 53.)  Finally, in an extremely similar case brought against Defendant in the Eastern District of New York—a case upon which Defendant heavily relies throughout its brief—the court found that the allegations satisfied the "use in commerce" requirement.  Ascentive, LLC v. Opinion Corp., No. Civ.A.10-4433, 2011 WL 6181452, at *5 (E.D.N.Y. Dec. 13, 2011) ("There is no dispute regarding the validity of plaintiffs' marks or that PissedConsumer used the marks in commerce and in connection with goods and services.").  Accordingly, regardless of whether or not these allegations satisfy other requirements for a claim of trademark infringement, the Court finds that the Complaint sufficiently alleges that Defendant used Plaintiff's mark "in commerce" and "in connection with any goods or services" for purposes of stating a claim under 15 U.S.C. §§ 1114 and 1125(a).

### 2.    Whether this Case Involves Nominative Fair Use

"Nominative" fair use of a trademark can occur when "the only practical way to refer to something is to use the trademarked term.'"  Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 214 (3d Cir. 2005) (quoting KP Permanent Make-Up, Inc. v. Lasting Impression I,

---

[7]  The Court acknowledges that, unlike the Defendant in the present matter, the defendant in J.G. Wentworth offered the same services as the plaintiff whose mark it was using.  Nevertheless, the Court finds that Defendant's alleged use of Plaintiff's mark to sell advertising to others—as opposed to advertising its own products—is sufficient for purposes of the "use in commerce" requirement of the Lanham Act.  The fact that Defendant and Plaintiff do not compete is certainly relevant to whether Defendant's use of the "AMERIGAS" mark causes customer confusion, but an allegation of competition is not necessary to establish that Defendant used the mark in connection with the services it offered on http://amerigas.pissedconsumer.com.

Inc., 328 F.3d 1061, 1072 (9th Cir. 2003)).  The Third Circuit has set forth a two-step approach

for analyzing whether the nominative use is fair, and therefore permitted under the Lanham Act.

First, "[t]he plaintiff must first prove that confusion is likely due to the defendant's use of

plaintiff's mark."  Id. at 222.  To determine whether the plaintiff meets this burden, courts should

consider four of the ten factors traditionally used to assess likelihood of confusion:

> (1) the price of the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase; (2) the length of time the defendant
> has used the mark without evidence of actual confusion; (3) the intent of the
> defendant in adopting the mark; and (4) the evidence of actual confusion.

Id. at 225-26.  Once the plaintiff shows that confusion is likely, the burden shifts to the defendant

"to show that its nominative use of plaintiff's mark is nonetheless fair."  Id. at 222.  The

defendant satisfies the fairness requirement by demonstrating the following:

> (1) that the use of plaintiff's mark is necessary to describe both the plaintiff's product
> or service and the defendant's product or service; (2) that the defendant uses only so
> much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3)
> that the defendant's conduct or language reflect the true and accurate relationship
> between plaintiff and defendant's products or services.

Id.

Here, Defendant contends that its purpose in employing the "AMERIGAS" trademark

was merely to describe Plaintiff's goods and services, not to compete with Plaintiff, and so this

action should be treated as a nominative fair use case.  (Def.'s Mem. 8-9.)  Plaintiff cursorily

rejects this argument, asserting only that "Defendant's profits from its use of AmeriGas'[s]

trademark through the AdWords program completely undercut any notion of 'nominative use' of

AmeriGas'[s] mark."  (Pl.'s Resp. Opp'n 7.)[8]

---

[8]  In support of this argument, Plaintiff relies on Playboy Enterprises, Inc. v. Netscape
Communications Corp., 354 F.3d 1020 (9th Cir. 2004).  The Third Circuit, however, has

Applying the Third Circuit's two-part analysis, the Court concludes that it would be premature to make any findings with respect to nominative fair use without the benefit of discovery. The four factors used to assess likelihood of confusion in this context—the care and attention expected of consumers when making a purchase, the length of time the mark was used without confusion, Defendant's intent, and actual evidence of confusion—are all fact-intensive, and require evidentiary support.[9]  Similarly, the Court cannot conclude whether Defendant's use of the mark is "fair" based solely on the allegations contained in the Complaint. The three-part fairness test first requires the Court to determine whether Defendant's use of Plaintiff's mark is necessary to describe both Plaintiff and Defendant's services. As the operator of a so-called "gripe site"—a website that allows users to post negative reviews and comments about various businesses—it is highly probable that Defendant would prevail on this element, as it would be impossible for users to effectively criticize Plaintiff without naming it. The second and third elements, however, necessitate more substantial factual development. These require the Court to determine that Defendant uses only so much of Plaintiff's mark as is necessary to describe Plaintiff's product, and that Defendant's conduct or language accurately reflects the relationship between Plaintiff and Defendant's products or services. Accordingly, the Court denies Defendant's Motion to Dismiss on this basis.

---

expressly rejected the nominative fair use analysis employed by the Ninth Circuit in that case. See Century 21, 425 F.3d at 228 ("[W]e conclude that the [Ninth Circuit's] test as written suffers from a lack of clarity. This is evident in the contortions that the Ninth Circuit Court of Appeals itself has gone through in applying it, the confusion that the District Court here encountered in its application, and in our conviction that a modified inquiry would aid in reaching the right result."). The Court therefore declines to rely on Playboy as a persuasive precedent.

[9]  A discussion of the remaining six likelihood of confusion factors is contained in the following section of the Memorandum.

### 3.       Likelihood of Confusion

Defendant contends that Plaintiff's trademark claims must be dismissed because there is no likelihood of confusion.  (Def.'s Mem. 9-13.)  According to Defendant, "claims such as those made by [Plaintiff] here cannot amount to a well-pleaded allegation of a likelihood of confusion because it would be obvious to any prospective customer that the trademark use could not be originating with or approved by the claimant."  (Id. at 10.)  In response, Plaintiff asserts that customers are likely to be confused by the following:

> (1) the sheer number of AmeriGas'[s] competitors' advertisements that appear on the website; (2) the cluttered fashion in which those advertisements are displayed; (3) the overwhelming, top-heavy placement of those advertisements on the "AmeriGas" subdomain, before users even see the consumer reviews and comments; and (4) Defendant's use of Plaintiff's "AMERIGAS" trademark in its website metadata.

(Pl.'s Resp. Opp'n 8.)  Essentially, Plaintiff appears to be claiming that prospective customers would see the "AMERIGAS" mark in Defendant's subdomain, assume that the website was affiliated with Plaintiff, and click on one of the advertisements posted by Plaintiff's competitors, believing that the ad would direct them to products and services provided by Plaintiff itself.

As discussed above, the Third Circuit typically considers ten factors to determine whether or not the use of a mark would create a likelihood of confusion.  See A & H Sportswear, 237 F.3d at 211.  In the previous section, the Court briefly addressed factors three through six, which are applied in the narrow context of nominative fair use.  An analysis of the remaining six factors further convinces the Court that this litigation should be allowed to proceed to the discovery phase.

The first and second factors are: (1) the degree of similarity between the owner's mark and the alleged infringing mark, and (2) the strength of the owner's mark.  Here, Defendant is

using the exact mark owned by Plaintiff, which the Complaint alleges "is a valid and distinctive federally registered trademark[.]"  (Compl. ¶ 55.)  The seventh factor—whether non-competing goods are marketed through the same channels of trade and advertised through the same media—arguably supports Plaintiff's allegations, as both parties market their services on the Internet.  The next factor looks to whether the targets of the parties' sales efforts are the same. The facts of this case make this a complicated consideration.  While it is true that Defendant is not in the business of selling propane, it allegedly profits from attracting Plaintiff's customers to its website.  If the unhappy purchasers of Plaintiff's products are posting complaints on http://amerigas.pissedconsumer.com, Plaintiff's competitors may be more likely to advertise on Defendant's website, and Plaintiff may be more inclined to pay for Defendant's reputation management services.  Next, looking to the relationship of the goods in the minds of consumers because of the similarity of function, the Court finds that this factor favors Defendant.  Even assuming that Defendant in some way profits from having Plaintiff's customers access its website, the goods offered by each party in no way overlap.  The final factor essentially examines whether Plaintiff is likely to expand into Defendant's market.  Because there is no allegation that Plaintiff intends to create an Internet forum for disgruntled consumers, this element also favors Defendant.

After considering the likelihood of confusion factors, the Court concludes that Plaintiff has alleged sufficient facts to state a claim for relief.  In making this determination, the Court is mindful of the Eastern District of New York's <u>Ascentive</u> opinion, which involved similar, if not identical, claims of trademark infringement and unfair competition against Defendant.  In ruling on the plaintiffs' motion for a preliminary injunction, the <u>Ascentive</u> court stated the following in

regards to the likelihood of confusion element:

> There is little likelihood that a potential consumer visiting PissedConsumer would be confused about whether it was the source of plaintiffs' goods or whether [the plaintiffs] sponsored or otherwise approved of PissedConsumer's use of their marks. Indeed, the domain names here . . . bespeak negativity concerning plaintiffs' products. So too does PissedConsumer's logo—a frowning red cartoon face with a furrowed brow and a speech bubble containing characters in place of an expletive—and PissedConsumer's tagline: "TELL THE WORLD. BE HEARD." The comments posted on the site are also decidedly negative. . . . It strains credulity that an Internet user would believe that plaintiffs would sponsor or otherwise approve of a site that contains such criticisms. Instead, after a brief inspection of the content of PissedConsumer's website, the user would realize that they were visiting a third-party gripe site for "pissed" consumers.

Ascentive, 2011 WL 6181452, at *9. The Ascentive opinion is well-written and very persuasive. This Court also finds it difficult to believe that a person searching online for Plaintiff's products would be confused into thinking that a site called "PissedConsumer"—which contains an abundance negative reviews, offers no propane products of its own, and links to the websites of Plaintiff's competitors—was in some way affiliated with or endorsed by Plaintiff. Nevertheless, it is also important to emphasize that the Ascentive opinion addressed a motion for a preliminary injunction, not a motion to dismiss. In order to prevail, the plaintiffs in that case were required to demonstrate "'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiffs'] favor.'" Id. at *5 (quoting Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010)). Here, by contrast, the burden placed on Plaintiff is much lighter. In order to defeat Defendant's Motion to Dismiss, it must only establish that it has sufficiently stated a claim for relief, not that it is likely to succeed on the merits of its case. Furthermore, as Defendant itself has noted, the ruling in Ascentive came after a discovery period and two evidentiary hearings.

17

(Def.'s Mem. 10.)  While Plaintiff may face a tall task in demonstrating that Defendant's use of

its mark is confusing, it is entitled to gather evidence to support this claim.  The Court therefore

denies Defendant's Motion to Dismiss on the basis that Plaintiff failed to allege likelihood of

confusion.

### 4.        Initial Interest Confusion

Initial interest confusion occurs when a competitor lures "'potential customers away from

a producer by initially passing off its goods as those of the producer's, even if confusion as to the

source of the goods is dispelled by the time any sales are consummated.'"  Checkpoint Sys., Inc.

v. Check Point Software Techs., Inc., 269 F.3d 270, 294 (3d Cir. 2001) (quoting Dorr–Oliver,

Inc. v. Fluid Quip, Inc., 94 F.3d 376, 382 (7th Cir. 1996)).  The Third Circuit has found that

initial interest confusion is "probative of a Lanham Act violation," recognizing that "[w]ithout

initial interest protection, an infringer could use an established mark to create confusion as to a

product's source thereby receiving a 'free ride on the goodwill' of the established mark."  Id. at

294-95.  The concern is that this "bait and switch" will influence "'the buying decisions of

consumers in the market for the goods, effectively allowing the competitor to get its foot in the

door by confusing consumers.'"  Id. at 294 (quoting Dorr–Oliver, 94 F.3d at 382).

Defendant cites to Strick Corp. v. Strickland, 162 F. Supp. 2d 372 (E.D. Pa. 2001) for the

proposition that initial interest confusion is of dubious application in the context of the Internet.

(Def.'s Mem. 14.)  In Strick, the defendant, whose surname was "Strickland," registered the

domain name "strick.com" for use in connection with his work as a computer consultant and

software developer.  162 F. Supp. 2d at 373.  The plaintiff, "Strick Corp.", which manufactured

transportation equipment, brought Lanham Act claims against the defendant in connection with

18

the use of the domain name.  Id. at 373-75.  The plaintiff argued that defendant's website would

create initial interest confusion.  Id. at 377.  The court rejected this assertion, finding that

> any initial confusion that arises from Defendant's use of his strick.com domain
> site[—]specifically, that consumers will realize they are at the wrong site and go to
> an Internet search engine to find the right one—is not substantial enough to be legally
> significant. . . .  It is clear that Internet surfers are inured to the false starts and
> excursions awaiting them and are unlikely to be dissuaded, or unnerved when, after
> tak[ing] a stab at what they think is the most likely domain name for a particular web
> site[,] guess wrong and bring up another's webpage.

Id. (internal citations and quotations omitted).  In other words, even if a consumer is momentarily

confused into thinking that a website is associated with a particular business, the ease of

navigating the Internet makes it likely that he or she will simply begin a new search once the

confusion is dispelled, rather than settling for the competitor's product.

Although Defendant's argument is well-reasoned, the Court will allow Plaintiff to

proceed under an initial interest confusion theory for three reasons.  First, in Strick, the plaintiff

and the defendant operated completely different businesses, and the defendant's website made no

reference to the plaintiff or the transportation products it provided.  A consumer who visited the

defendant's website would therefore be unable to purchase transportation equipment from the

plaintiff or any of its competitors.  In short, there was no possibility of a "bait and switch."  In

this case, Defendant and Plaintiff do not compete, but Defendant's website specifically refers to

and describes Plaintiff's business and provides advertising links to Plaintiff's competitors.

Therefore, unlike the factual scenario in Strick, it is at least possible that a consumer who

conducted an Internet search for Plaintiff's business could arrive at Defendant's webpage and

purchase propane products from another company.

Second, the Strick opinion addressed a motion for summary judgment, which was filed

after the parties had an opportunity to conduct discovery.  Here, on a motion to dismiss, the

Court's knowledge of how Defendant's website is structured and operates is limited to the

allegations in the pleadings.

Third and finally, the Third Circuit has addressed initial interest confusion three times

since the Strick opinion was rendered, and each time it has found it to be a viable theory.

Checkpoint Sys., 269 F.3d at 294 ("We join these [other federal] circuits in holding that initial

interest confusion is probative of a Lanham Act violation."); Century 21 Real Estate Corp. v.

Lendingtree, Inc., 425 F.3d 211, 248 (3d Cir. 2005) ("[T]he use here may also give rise to

concerns under the 'initial interest confusion' doctrine."); McNeil Nutritionals, LLC v. Heartland

Sweeteners, LLC, 511 F.3d 350, 358 (3d Cir. 2007) ("We reaffirm the holding that initial interest

confusion is an independently sufficient theory that may be used to prove likelihood of

confusion.").  This Court was unable to locate anything in the Third Circuit's jurisprudence to

indicate that a theory of initial interest confusion is categorically prohibited in the Internet

context.  While it may ultimately be difficult to establish initial interest confusion in this case,

Plaintiff may nevertheless present evidence in support of this theory.  Defendant's Motion to

Dismiss on the grounds that initial interest confusion is inapplicable is therefore denied.

### 5.    Contributory Infringement

The United States Supreme Court has held that

> liability for trademark infringement can extend beyond those who actually mislabel
> goods with the mark of another.  Even if a manufacturer does not directly control
> others in the chain of distribution, it can be held responsible for their infringing
> activities under certain circumstances.    Thus, if a manufacturer or distributor
> intentionally induces another to infringe a trademark, or if it continues to supply its
> product to one whom it knows or has reason to know is engaging in trademark
> infringement, the manufacturer or distributor is contributorially responsible for any

harm done as a result of the deceit.

Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982).  The two elements of a "contributory infringement" claim are: "'(1) supply of a product, and (2) knowledge of direct infringement.'"  Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1432 (3d Cir. 1994) (quoting Fonovisa, Inc. v. Cherry Auction, Inc., 847 F. Supp. 1492, 1498 (E.D. Cal. 1994)).

Here, Defendant contends that, to the extent Plaintiff alleges it is liable for the comments or advertisements of third parties appearing on the PissedConsumer website, such a claim for contributory infringement must be dismissed.  (Def.'s Mem. 15-19.)  Specifically, Defendant argues that the Complaint fails to allege infringement on the part of anyone other than Defendant.  (Id.)  Without any underlying trademark violation, it cannot be liable for contributing to that infringement.  (Id.)  In response, Plaintiff asserts that it has sufficiently alleged Defendant was "either actually or constructively" aware of the "infringing advertisements" that appeared on its website.  (Pl.'s Resp. Opp'n 14.)  Accordingly, it has stated a claim for contributory infringement.

Contrary to Plaintiff's characterization of its Complaint, the Court is unable to find any allegation of trademark infringement by anyone other than Defendant.  In its Response in Opposition, Plaintiff cites to paragraphs thirty-three and thirty-four of the Complaint as allegations of infringement by third parties.  Paragraph thirty-three alleges that Defendant "displays numerous advertisements for third parties' products and services, including but not limited to advertisements for AmeriGas's competitors. . . .  These advertisements appear to be part of Google's advertising program.  Some of these advertisements use AmeriGas's trademark

21

in the text of the hyperlink that, if clicked, will take the Internet user to an AmeriGas competitor."  (Compl. ¶ 33.)  This paragraph merely alleges that third-party advertisers *used* Plaintiff's mark; nowhere does it allege that such use was infringing.  Plaintiff has not cited to—and the Court is unable to locate—any authority to support the proposition that use of a trademark in a hyperlink constitutes per se infringement.

Furthermore, even if the Court assumes Plaintiff intended to allege infringement on the part of the unnamed third-party advertisers, the Complaint does not specify that Defendant was aware of this infringement.  Paragraph thirty-four states in its entirety: "The advertisements are displayed through Google's 'AdWords' advertising program, in which Google allows PissedConsumer to profit from this display of third-party advertisements on its website every time a consumer 'clicks through' to one of its advertisements."  (Compl. ¶ 34.)  This paragraph alleges that Defendant profited from the advertisements, not that it had knowledge of infringing activity by other parties.  In sum, in the absence of a specific, unambiguous allegation that some person or entity other than Defendant infringed its trademark, the Court cannot find that Plaintiff has stated a claim for contributory infringement.  Therefore, the Court grants Defendant's Motion as to this claim.

**B.** **Whether Plaintiff's State Law Claims are Barred by the Communications Decency Act**

The Communications Decency Act, 47 U.S.C. § 230 ("CDA") states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  An "interactive computer service" refers to "any information service, system, or access software

provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." Id. § 230(f)(2). The three elements required for immunity pursuant to section 230(c) are as follows: "(1) that the defendant is a provider or user of an 'interactive computer service;' (2) that the asserted claims treat the defendant as the publisher or speaker of the information; and (3) that the information is provided by another 'information content provider.'" Parker v. Google, Inc., 242 F. App'x 833, 838 (3d Cir. 2007). Importantly, the CDA provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

Here, Defendant contends that Plaintiff's claims for violations of the UTPCPL (Count IV), interference with contractual and prospective contractual relations (Count V), and unjust enrichment (Count VI) are barred by the CDA. (Def.'s Mem. 20-23.) Specifically, Defendant asserts that it is entitled to CDA immunity because it is an interactive computer service and its alleged liability for these state law claims is premised on its role in publishing content created by others. (Id. at 21.) In response, Plaintiff argues that its state law claims derive solely from Defendant's own conduct rather than that of any third parties. (Pl.'s Resp. Opp'n 16-17.) According to Plaintiff, the Complaint alleges "that *Defendant* used the 'AMERIGAS' trademark (1) in its website subdomains, text and metadata, and (2) to trigger advertisements from AmeriGas'[s] competitors on Defendant's 'AmeriGas' subdomain." (Id. at 16.)[10]

_____

[10] Plaintiff separately argues that Defendant is not entitled to CDA immunity because its state law claims arise under laws that pertain to intellectual property. (Pl.'s Resp. Opp'n 17-18 (citing 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any

A review of the three counts at issue demonstrates that these claims are in fact premised on Defendant's own conduct.  The UTPCPL claim (Count IV) asserts, among other allegations, that Defendant has been "passing off goods and services advertised on the PissedConsumer.com website as those of AmeriGas's" and "[u]sing deceptive representations in connection with goods and services advertised on [the] PissedConsumer.com website and with AmeriGas's goods and services[.]"  (Compl. ¶ 87.)  The claim for interference with contractual and prospective contractual relations (Count V) alleges that Defendant "is aware that the postings on the PissedConsumer website as well as the misleading and confusing advertisements on the PissedConsumer website are likely to make it so that AmeriGas's customers and prospective customers no longer do business with AmeriGas."  (Id. ¶ 96.)  Finally, the unjust enrichment claim (Count VI) alleges that Defendant "knowingly benefited from its use of AmeriGas's trademark in conjunction with its advertising programs and has retained the benefits of its use of AmeriGas's trademarks[.]"  (Id. ¶ 103.)  Finally, incorporated by reference into all of these counts is Plaintiff's allegation that Defendant "encourages and creates the most negative postings it can on the PissedConsumer website[.]"  (Id. ¶ 20.)

The Complaint therefore explicitly alleges that Defendant not only allows third parties to post complaints on its website, it actually creates some of these posts as well.  The above claims also allege that Defendant exercises a degree of control over the advertisements on its webpage. In this respect, the present action is distinguishable from Rosetta Stone Ltd. v. Google, Inc., 732 F. Supp. 2d 628 (E.D. Va. 2010), a case relied upon by Defendant.  In Rosetta Stone, the court

---

law pertaining to intellectual property.").)  Because the Court finds that Plaintiff adequately alleged that these claims derive from Defendant's own conduct, it declines to consider this argument.

found that the defendant was entitled to CDA immunity because it qualified as an interactive computer service and because the third parties advertising on the defendant's website were responsible for selecting the terms that triggered the appearance of their ads.  732 F. Supp. 2d at 633.  Here, even if the Court assumes that Defendant qualifies as an interactive computer service, it cannot determine how Defendant's advertising system operates.  While Defendant argues that it does not control the advertising on its website, (Def.'s Reply Br. 13.), the Complaint alleges otherwise.  (See, e.g., Compl. ¶ 33 (alleging that Defendant itself "displays numerous advertisements for third parties' products and services"); id. ¶ 103 (alleging that Defendant "knowingly benefited from its use of AmeriGas's trademark in conjunction with its advertising programs") (emphasis added).)  The Court recognizes that elsewhere in the Complaint, Plaintiff alleges that the advertising on Defendant's website is implemented through Google's "AdWords" program, so the actual degree of control that Defendant exercises over the advertisements—as compared to the control exercised by Google or the advertisers themselves—is not entirely clear. (See Compl. ¶¶ 34, 36.)  At this stage of the litigation, however, the Court lacks information pertaining to how "AdWords" actually functions, and the Complaint alleges that Defendant had at least some role in how the advertisements are displayed.  Therefore, to the extent that the state law claims are premised on Defendant's placement of and profit from third party advertisements, they may proceed.  The Court therefore denies Defendant's Motion to Dismiss Counts IV, V, and VI. Nothing in this Memorandum, however, precludes Defendant from asserting CDA immunity as a defense later in this litigation.[11]

---

[11]  In addition to seeking dismissal of the state law claims pursuant to the CDA, Defendant also contends that these claims could be dismissed on the merits.  (Def.'s Mem. 23 n.5.)  This argument, however, is made in a footnote near the conclusion of the section of

**IV.      CONCLUSION**

For all of the foregoing reasons, the Court concludes as follows: (1) Plaintiff has properly alleged that Defendant used its "AMERIGAS" trademark in commerce and in connection with goods and services; (2) at the pleadings stage of the litigation, the Court cannot determine whether Defendant's nominative use of Plaintiff's mark is fair; (3) Plaintiff has alleged likelihood of confusion, and may rely on the doctrine of initial interest confusion; (4) Plaintiff has failed to properly allege that any party other than Defendant infringed upon its trademark; and (5) Plaintiff has sufficiently alleged that its state law claims are premised on the conduct of Defendant itself, rather than the actions of third parties.  Accordingly, Defendant's Motion to Dismiss all claims premised on a theory of contributory infringement is granted.  In all other respects, the Motion to Dismiss is denied.

An appropriate Order follows.

---

Defendant's brief that discusses CDA immunity.  Therefore, the Court has trouble concluding that Defendant has properly moved for dismissal on this basis.  Indeed, Plaintiff has not even responded to this argument.  Accordingly, while Defendant is not precluded from moving to dismiss these claims on the merits at a later time, the Court declines to consider its argument in the current Memorandum.